# United States Court of Appeals
## For the First Circuit

No. 10-2240

JACKIE HOSANG LAWSON; JONATHAN M. ZANG,

Plaintiffs, Appellees/Cross-Appellants,

v.

FMR LLC, f/k/a FMR Corp.; FMR CO., INC.; FMR CORP., d/b/a
Fidelity Investments; FMR LLC, d/b/a Fidelity Investments;
FIDELITY BROKERAGE SERVICES, LLC, d/b/a Fidelity Investments;
FIDELITY MANAGEMENT & RESEARCH COMPANY,

Defendants, Appellants/Cross-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Paul E. Nemser, with whom Wilfred J. Benoit, Jr., Goodwin
Proctor LLP, Eugene Scalia, Jennifer J. Schulp, and Gibson, Dunn &
Crutcher LLP were on brief, for appellants/cross-appellees.
Robin S. Conrad, Shane B. Kawka, National Chamber Litigation
Center, Inc., Willis J. Goldsmith, Wendy C. Butler, and Jones Day,
on brief for Chamber of Commerce of the United States of America,
amicus curiae.
Indira Talwani, with whom Segal Roitman, LLP, was on brief,
for appellee/cross-appellant Jackie Hosang Lawson.
Jonathan M. Zang pro se.
Mary J. Rieser, Attorney, with whom M. Patricia Smith,
Solicitor of Labor, Jennifer S. Brand, Associate Solicitor, and
Jonathan T. Rees, Acting Counsel for Whistleblower Programs, were
on brief, for the Secretary of Labor as amicus curiae.
Mark D. Cahn, General Counsel, Richard M. Humes, Associate

General Counsel, and <u>Thomas J. Karr</u>, Assistant General Counsel, on brief for the Securities and Exchange Commission as amicus curiae.

---

February 3, 2012

---

**LYNCH**, **Chief Judge**.  This interlocutory appeal is from the district court's order denying a Rule 12(b)(6) motion to dismiss two separate but related cases under the whistleblower protection provision of section 806 of the Sarbanes-Oxley Act of 2002 (SOX), codified at 18 U.S.C. § 1514A.  See Lawson v. FMR LLC, 724 F. Supp. 2d 141 (D. Mass. 2010); Fed. R. Civ. P. 12(b)(6).  It raises important questions of first impression.

The plaintiffs, Jackie Hosang Lawson and Jonathan M. Zang, brought separate suits alleging unlawful retaliation by their corporate employers, which are private companies that act under contract as advisers to and managers of mutual funds organized under the Investment Company Act of 1940.  Because the two suits shared a common defendant, FMR LLC, and both raised the same question of the scope of employees subject to protection under § 1514A, the district court addressed both cases in a single order.  Lawson, 724 F. Supp. 2d at 144.

The district court concluded that the whistleblower protection provision within SOX section 806 extends its coverage beyond "employees" of "public" companies (as those terms are defined in the section) to encompass also the employees of private companies that are contractors or subcontractors to those public companies.  Id. at 163.  Concerned that this interpretation could be thought too broad, the district court then imposed a limitation, not found in the text, that the employees must be reporting

-3-

violations "relating to fraud against shareholders."  Id. 159-60. We interpret the statute differently and reverse.

## I.

### Background

Both plaintiffs are suing their former employers, which are private companies that provide advising or management services by contract to the Fidelity family of mutual funds.

The Fidelity mutual funds are not parties in either suit, and are investment companies organized under the Investment Company Act of 1940, 15 U.S.C. § 80a-3(a)(1).  They are registered with the Securities and Exchange Commission (SEC) and are required to file reports under section 15(d) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78o(d).  The mutual funds are owned by their shareholders and are not owned or controlled by, or affiliated with, any of the defendant companies.  The Fidelity funds are overseen by a single Fidelity Mutual Fund Board of Trustees; a super-majority of the Board's members are independent of the funds' advisers.  As is not unusual among funds organized under the Investment Company Act, the Fidelity funds have no employees of their own.

Plaintiff Zang was employed by Fidelity Management & Research Co. and later by FMR Co., Inc., which was formed as a subsidiary of Fidelity Management & Research Co. (collectively, the Fidelity Management companies).  The Fidelity Management companies

have entered into contracts with certain of the Fidelity mutual funds to serve as investment advisers or sub-advisers. As investment advisers to the funds, the Fidelity Management companies are subject to the provisions of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq. The Fidelity Management companies are subsidiaries, directly or indirectly, of FMR LLC.

Zang's employment was terminated in July 2005. On September 15, 2005, he filed a complaint with the Occupational Health & Safety Administration (OSHA) of the Department of Labor (DOL), based on 18 U.S.C. § 1514A(b)(1)(A), which allows a person who alleges discharge or discrimination in violation of § 1514A(a) to seek relief by filing a complaint with the Secretary of Labor. The Secretary has, in turn, delegated enforcement responsibility for § 1514A to the Assistant Secretary for Occupational Safety and Health. See 67 Fed. Reg. 65,008, 65,008 (Oct. 22, 2002). Zang alleged that he had been terminated by the Fidelity Management companies in retaliation for raising concerns about inaccuracies in a draft revised registration statement for certain Fidelity funds. Zang alleged that he reasonably believed these inaccuracies violated several federal securities laws.

OSHA dismissed Zang's complaint, finding that he was a covered employee within the meaning of § 1514A(a), that is, he was an employee "covered" by the whistleblower protections, but that he had not engaged in conduct protected by that subsection. Zang

objected and had a hearing before an Administrative Law Judge (ALJ). The Fidelity Management companies moved for summary decision, contending, among other things, that Zang was not a covered employee. After allowing limited discovery on the issue, the ALJ granted summary decision for the Fidelity Management companies on that basis and dismissed. Zang v. Fid. Mgmt. & Research Co., No. 2007-SOX-00027, 2008 WL 7835900 (Dep't of Labor ALJ Mar. 27, 2008).

Interpreting § 1514A(a), the ALJ concluded that merely being an employee of a privately held contractor to a fund was insufficient to come within the term "employee."[1]

Zang petitioned for review of the ALJ decision by the DOL's Administrative Review Board (ARB).[2] Zang then gave notice to

---

[1] The ALJ also concluded that Zang would only be a covered employee if the private Fidelity Management companies acted on behalf of the public Fidelity funds as contractors or subcontractors "in employment matters . . . when [they] terminated [Zang's] employment." Zang v. Fid. Mgmt. & Research Co., No. 2007-SOX-00027, 2008 WL 7835900, at *14 (Dep't of Labor ALJ Mar. 27, 2008). The ALJ concluded that the funds had no role in the Fidelity Management companies' employment decisions and Zang had not sufficiently alleged that the private Fidelity Management companies had acted as the funds' "agent or contractor in regard to employment matters" and dismissed his complaint. Id. at *18. That issue is not before us.

Zang also argued before the ALJ that the private Fidelity Management companies and the public Fidelity funds should be considered a "single integrated enterprise" for the purpose of evaluating whether he was a covered employee under § 1514A(a). Zang, 2008 WL 7835900, at *15. The ALJ rejected this argument, id. at *18, and that issue is also not before us.

[2] The Secretary of Labor has delegated review of decisions by DOL ALJs to the DOL's ARB. See 67 Fed. Reg. 64,272, 64,272-73

the DOL of his intention to file an action in federal court and filed his complaint against the Fidelity Management companies in the district court, terminating his appeal with the ARB. Under SOX, a claimant may seek de novo review in federal district court if the DOL has not issued a final decision on a complaint within 180 days of its filing.[3] 18 U.S.C. § 1514A(b)(1)(B).

Plaintiff Lawson was employed by Fidelity Brokerage Services, LLC, a private subsidiary of FMR Corp., which was succeeded by FMR LLC. Together these companies operate under the trade name Fidelity Investments. Lawson filed SOX complaints against her employer and its parent with OSHA pursuant to § 1514A(b)(1)(A) in 2006 while she was still employed. She alleged retaliation against her for raising concerns primarily relating to cost accounting methodologies. She resigned her employment in September 2007, claiming that she had been constructively discharged. One year after filing, Lawson notified OSHA that she intended to seek review of her SOX claim in federal court. Her claims, which had been consolidated, were closed by the DOL, and she filed a complaint against her employers in the district court.

_____

(Oct. 17, 2002).

[3] The district court determined that although there was an ALJ decision in Zang's case, because that decision was on review with the ARB, it was not final. Lawson v. FMR LLC, 724 F. Supp. 2d 141, 151 (D. Mass. 2010). And since more than 180 days had elapsed since his claim was filed with OSHA, his complaint was properly before the district court. Id. at 152. That portion of the district court's opinion is not an issue on appeal.

The defendants, all private companies, filed motions to dismiss under Rule 12(b)(6), arguing that the plaintiffs were not covered employees under § 1514A(a) and, in the alternative, that they had not engaged in protected activity under § 1514A(a)(1). The district court denied the motions to dismiss as to the plaintiffs' claims alleging retaliation in violation of § 1514A, which is the subject of this appeal.[4] Lawson, 724 F. Supp. 2d 141.

The district court held that the SOX whistleblower protection provisions of § 1514A(a) extend to employees of private agents, contractors, and subcontractors to public companies; that the plaintiffs had sufficiently pleaded facts alleging that their private company employers were "either contractors, subcontractors, or agents of publicly held investment companies;" and that both plaintiffs had sufficiently alleged that they had engaged in protected activity under § 1514A(a)(1). Lawson, 724 F. Supp. 2d at 163-65.

The defendants moved that the dispositive issue of § 1514A(a)'s applicability to the plaintiffs be certified for interlocutory appeal under 28 U.S.C. § 1292(b). The district court granted the motion, certified a "controlling question of law" to this court, and stayed the cases before it. Lawson v. FMR LLC, 724

---

[4] The district court granted the motions to dismiss as to the plaintiffs' state law claims for wrongful discharge in violation of public policy. Lawson, 724 F. Supp. 2d at 167. The dismissal of those claims is not a subject of this appeal.

F. Supp. 2d. 167, 169 (D. Mass. 2010).  The defendants petitioned

this court for interlocutory review, and the plaintiffs each filed

cross-petitions urging this court to grant the appeal.  We granted

the parties' cross-petitions for interlocutory review.  Lawson v.

FMR LLC, No. 10-1944 (1st Cir. Oct. 25, 2010).

II.

Statutory Construction

We limit our review of the district court's order to the

question the court certified:

> Does the whistleblower protection afforded by
> Section 806(a) of the Sarbanes-Oxley Act, 18
> U.S.C. § 1514A, apply to an employee of a
> contractor or subcontractor of a public
> company, when that employee reports activity
> which he or she reasonably believes may
> constitute a violation of 18 U.S.C. §§ 1341,
> 1343, 1344, or 1348; any rule or regulation of
> the Securities and Exchange Commission; or any
> provision of Federal law and such a violation
> would relate to fraud against shareholders of
> the public company?

Lawson, 724 F. Supp. 2d at 169; see also 28 U.S.C. § 1292(b).[5]

Our review is de novo, both because this is an appeal

from a denial of a Rule 12(b)(6) motion and because the issue of

_____

[5] Although the Supreme Court has held that under 28 U.S.C. § 1292(b), "appellate jurisdiction applies to the order certified to the court of appeals, and is not tied to the particular question formulated by the district court," Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205 (1996), we need not exercise our power to go beyond the question certified, and do not do so here. See 16 Wright & Miller, Federal Practice and Procedure § 3929 (2d ed. 2011) ("Of course this power need not be exercised -- ordinarily the question specified by the district court . . . will be the focus of arguments on the merits.").

statutory interpretation is one of law.  See <u>U.S. ex rel. Hutcheson</u> v. <u>Blackstone Med., Inc.</u>, 647 F.3d 377, 383 (1st Cir. 2011); <u>Carnero</u> v. <u>Bos. Scientific Corp.</u>, 433 F.3d 1, 4 (1st Cir. 2006).

A.        <u>Construction of the statute</u>

        1.        <u>Text of § 1514A(a)</u>

        This case turns on the interpretation of SOX's whistleblower protection provision, codified at 18 U.S.C. § 1514A. It "is a relatively small part of the Sarbanes-Oxley Act which is composed of many separate statutes and statutory schemes aimed at achieving the Act's investor-protection goals." <u>Carnero</u>, 433 F.3d at 5.

        We start our analysis with the particular subsection at issue before considering other relevant text in the statute, both in the section and elsewhere.  Section 806 of SOX reads in pertinent part:

> SEC. 806. PROTECTION FOR EMPLOYEES OF PUBLICLY TRADED COMPANIES WHO PROVIDE EVIDENCE OF FRAUD.
>
> (a) In General. -- Chapter 73 of title 18, United States Code, is amended by inserting after section 1514 the following:
>
> "§ 1514A. Civil action to protect against retaliation in fraud cases
>
> "(a) Whistleblower protection for employees of publicly traded companies. -- No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15

U.S.C. 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee--

"(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by–

"(A) a Federal regulatory or law enforcement agency;

"(B) any Member of Congress or any committee of Congress; or

"(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

"(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders."

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 806, 116 Stat. 745, 802-03 (emphasis added).[6]   The interpretation of the emphasized language in the text of subsection (a) is in dispute.

The parties agree only that this provision extends whistleblower protection to employees of "public companies" -- that is, those with a class of securities registered under section 12 of the 1934 Act or those that file reports with the SEC pursuant to section 15(d) of the 1934 Act.  While literally one of these two categories encompasses companies with publicly traded stock, we use the term "public companies" as a shorthand for both categories because companies required to file reports with the SEC pursuant to section 15(d), such as the Fidelity mutual funds, are "public" in the sense that they have issued securities that may be sold to the public and are required to make periodic reports to their investors.   The question is whether Congress intended the whistleblower provisions of § 1514A also to apply to those who are employees of a contractor or subcontractor to a public company and

---

[6]  Section 1514A(a) has since been amended by Congress.  This is the unamended text in force at all pertinent times here.

who engage in protected activity.[7]  No court of appeals has ruled

on this issue.[8]

---

[7]  As the case comes to us, the plaintiffs' employers are not acting as agents for employment purposes of the Fidelity mutual funds, which are public companies but have no employees.  Their employers' contracts with those funds are not for employment purposes.

Some opinions by the DOL ARB and by DOL ALJs have indicated that an employee of a non-public company may be able to proceed against his or her employer under § 1514A where such a non-public employer is a contractor, subcontractor, or agent to a public company for employment purposes -- that is, where the non-public company retaliates against its own employee at the public company's behest.  See Klopfenstein v. PCC Flow Techs. Holdings, Inc., No. 04-149, 2006 WL 3246904, at *10 (Dep't of Labor ARB May 31, 2006); Zang, 2008 WL 7835900, at *14; but see Johnson v. Siemens Bldg. Techs., Inc., No. 08-032, 2011 WL 1247202, at *12 (Dep't of Labor ARB Mar. 31, 2011) (stating that Klopfenstein should be read as stating the broader proposition that a private company can be held liable under § 1514A where such private company would be considered a public company's agent under common law agency principles, not only when the private company is the public company's agent for employment purposes).

Again, neither plaintiff argues before us that we are faced with a situation where a private company acts as a contractor, subcontractor, or agent of a public company for employment purposes and retaliates against its own employee at the direction of the public company.  We express no opinion on the scope of § 1514A(a)'s coverage in such a situation.

[8]  In Carnero v. Bos. Scientific Corp., 433 F.3d 1 (1st Cir. 2006), we held that § 1514A did not have extraterritorial effect. In order to reach the question of extraterritoriality, we "assume[d], for present purposes, but without deciding" that the plaintiff in that case was a covered employee of the public company Boston Scientific Corporation (BSC), even though he was employed by BSC's foreign subsidiaries.  Id. at 6.  However, we also stated that "[n]either party . . . contest[ed] that [the plaintiff] was a covered employee of BSC for purposes of seeking whistleblower relief under" SOX; instead they focused all of their arguments on the extraterritorial reach of section 806.  Id.  The issue of whether § 1514A(a) covers employees of companies which are under contract to public companies was not presented to us in Carnero.

The only other reported district court opinion addressing this question rejected the argument accepted by the district court

The defendants argue that § 1514A(a) provides that no public company -- or any officer, employee, contractor, subcontractor, or agent of that company -- may discriminate against an employee <u>of such public company</u> for engaging in protected whistleblowing activity. The defendants read the listing of "officer, employee, contractor, subcontractor, or agent" in § 1514A(a) as identifying who is barred from taking retaliatory action against the employees of public companies, but not as extending coverage to those enumerated entities' own employees.

The plaintiffs contend that the covered "employee" who is given whistleblower protection includes both the employees of public companies <u>and</u> those who are the employees of those public companies' officers, employees, contractors, subcontractors, or agents.

While different readings may be given the term "employee" within the emphasized language of the text of § 1514A(a) itself as to whether the protected employee refers only to employees of the

---

here. In <u>Brady</u> v. <u>Calyon Sec. (USA)</u>, 406 F. Supp. 2d 307 (S.D.N.Y. 2005), the court concluded that the reference to "any officer, employee, contractor, subcontractor, or agent of such company" in § 1514A(a) "simply lists the various potential actors who are prohibited from engaging in discrimination on behalf of a covered employer." <u>Id.</u> (quoting <u>Minkina</u> v. <u>Affiliated Physicians Grp.</u>, No. 2005-SOX-00019, 2005 WL 4889024, at *5 (Dep't of Labor ALJ Feb. 22, 2005)) (internal quotation marks omitted).

Two unreported district court cases have also addressed the question. <u>See</u> <u>Ervin</u> v. <u>Nashville Peace & Justice Ctr.</u>, No. 07-0832, 2008 WL 4449920, at *7 (M.D. Tenn. Sept. 29, 2008); <u>Rao</u> v. <u>Daimler Chrysler Corp.</u>, No. 06-13723, 2007 WL 1424220, at *3 (E.D. Mich. May 14, 2007).

public companies, principles of statutory interpretation lead us to interpret § 1514A(a) in favor of such a limitation. The title of section 806 and the caption of § 1514A(a) are statements of congressional intent which go against plaintiffs' interpretation. Other provisions of SOX also support and are more consistent with the defendants' reading and inconsistent with the plaintiffs' reading. Our reading of "employee" as excluding from coverage employees of officers, employees, contractors, subcontractors, and agents of public companies is also strongly confirmed by the pre-passage legislative history of this section and other sections of SOX and the purpose of the legislation. Further confirmation is provided by the later actions of Congress in rejecting a bill meant to amend SOX and in congressional acceptance of other amendments.

That the immediate text within § 1514A(a) may be read differently as to the scope of the protected "employees" as a matter of grammar needs little discussion. In our view, the more natural reading is the one advanced by the defendants. Each side has an argument that had Congress just added a few words, its intent would have been clearer,[9] and none of these arguments resolve the case. That intent does become clearer if one looks

---

[9] For instance, Congress could have more clearly enacted defendants' interpretation of § 1514A(a) by extending the provision's coverage only to "an employee of such company." Or Congress could have clearly enacted the plaintiffs' interpretation by defining "employee" or explicitly adding coverage of employees of advisers to investment companies organized under the Investment Company Act of 1940.

beyond the immediate phrases in subsection (a). Both circuit precedent and Supreme Court precedent require that we examine the broader statutory framework, including particularly the nearby language, Comm'r v. Lundy, 516 U.S. 235, 250 (1996); United States v. Ozuna-Cabrera, 663 F.3d 496, 499 (1st Cir. 2011), and the title and caption, Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 529 (1947); Berniger v. Meadow Green-Wildcat Corp., 945 F.2d 4, 9 (1st Cir. 1991).

We conclude that only the employees of the defined public companies are covered by these whistleblower provisions; the clause "officer, employee, contractor, subcontractor, or agent of such company" goes to who is prohibited from retaliating or discriminating, not to who is a covered employee and so does not violate the rule against rendering superfluous any statutory language. The text of § 1514A(a) first identifies covered employers: those with a class of securities registered under section 12 of the 1934 Act or those that file reports with the SEC pursuant to section 15(d) of the 1934 Act. Such public companies may not retaliate[10] against their own employees who engage in protected activity. Section 1514A(a) then enumerates a list of representatives of such employers, including those who are

---

[10] We use the term "retaliate" to cover "discharge, demote, suspend, threaten, harass, or in any other manner discriminate . . . in the terms and conditions of employment." 18 U.S.C. § 1514A(a).

-16-

contractors or subcontractors, and they are also barred from retaliating against employees of the covered public-company employer who engage in protected activity.

The plaintiffs and their amici argue that, because § 1514A(a) forbids retaliation <u>by</u> "any officer, employee, contractor, subcontractor, or agent" of a public company, that provision must forbid retaliation <u>against</u> an employee of a contractor, subcontractor, or agent to a public company. But plaintiff Lawson and plaintiffs' amici also reject the district court's limiting principle for their broad reading. As a matter of logic, the conclusion does not follow from its premise. As a matter of language, the argument ignores its implication: if an employee of "any" contractor, subcontractor, or agent is protected, Congress must, by the same reasoning, have intended to protect the employee of "any" officer or employee of a public company. This argument both creates anomalies and provides very broad coverage.

Section 1514A(a)'s list of company representatives serves, instead, to ensure an employee of a public company is covered under the provision if he or she were harassed by officers, other employees, or contractors or subcontractors to the public company for reporting fraud in that public company.[11]

---

[11] As said, our interpretation does not render the listing clause superfluous but gives it meaning.

One of our sister circuits has, in addition, hypothesized a particular fact situation. In <u>Fleszar</u> v. <u>U.S. Dep't of Labor</u>, 598 F.3d 912 (7th Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 423 (2010),

2.    The title of section 806 and the caption of § 1514A(a)

Both the title of SOX section 806, within which § 1514A(a) is housed, and the caption of § 1514A(a) itself are explicit guides to the limits on the meaning of the textual phrase within § 1514A(a).  Section 806 states it concerns "Protection for Employees of Publicly Traded Companies Who Provide Evidence of Fraud."  From that alone, it would be odd to read § 1514A(a) as covering employees of private companies.  It is unlikely Congress intended the term "Civil action to protect against retaliation in fraud cases" in the heading of § 1514A to be broader than the terms of the "Protection" discussed in the title of section 806.

Congress did not rest there.  It repeated the limitation "Whistleblower protection for employees of publicly traded companies" in the caption in the first line of the text of subpart

Judge Easterbrook observed, in dicta, that "[t]he idea behind" the provision listing contractors, subcontractors, and agents in § 1514A(a) as entities by whom retaliation cannot take place "is that a covered firm, such as IBM, can't retaliate against whistleblowers by contracting with an ax-wielding specialist (such as the character George Clooney played in 'Up in the Air')."  Id. at 915; see also Kalkunte v. DVI Fin. Servs., Inc., No. 2004-SOX-00056, 2005 WL 4889006 (Dep't of Labor ALJ July 18, 2005), aff'd, Nos. 05-139, 05-140, 2009 WL 564738 (Dep't of Labor ARB Feb. 27, 2009) (holding that the complaining employee of a public company could bring a § 1514A action against such company's private contractor where the contractor managed the public company's operations and retaliated against the complainant).  We merely note this and have no need to comment further.

(a) of § 1514A. This double limitation strongly works against plaintiffs' interpretation.

Supreme Court, as well as circuit, law requires that we consider the title and the caption of the section under which the language appears. See Bhd. of R.R. Trainmen, 331 U.S. at 529; Ozuna-Cabrera, 663 F.3d at 499 n.3; Berniger, 945 F.2d at 9. It is certainly true that "the title of a statute and the heading of a section cannot limit the plain meaning of the text." Bhd. of R.R. Trainmen, 331 U.S. at 528-29. This is not our issue: the caption of § 1514A(a) does not in any way contradict the plain text, but sheds light on the meaning of the text. The Supreme Court has been clear that titles and captions should be used "[f]or interpretive purposes . . . when they shed light on some ambiguous word or phrase." Id. at 529; see also Berniger, 945 F.2d at 9 ("It is well established that a statute's title may aid in construing any ambiguities in a statute."). The title and the caption each contain the phrase, "employees of publicly traded companies," which supports the reading that the use of the term "employees" underneath refers to "employees of publicly traded companies."

The Supreme Court has addressed a case presenting a similar question to the one here. INS v. Nat'l Ctr. for Immigrants' Rights, Inc. (NCIR), 502 U.S. 183 (1991). At issue was a regulation entitled "Condition against unauthorized employment," the text of which referred to "[a] condition barring employment."

-19-

8 C.F.R. § 103.6(a)(2)(ii) (1991).  The parties disagreed whether the word "employment" in the text referred to employment generally or more narrowly to unauthorized employment.  NCIR, 502 U.S. at 189.  The Court ruled that "[t]he text's generic reference to 'employment' should be read as a reference to the 'unauthorized employment' identified in the paragraph's title."  Id.  We follow the same reasoning as to § 1514A(a): the "generic reference" to "employee" in the text "should be read as a reference to" the "employees of publicly traded companies" identified in that subsection's caption.[12]

Plaintiffs' fallback is to their argument that the title and the caption do not mean what they say.  Just as the term "publicly traded companies" is a shorthand for the two categories of covered companies, plaintiffs argue that the title and caption are no more than a second shorthand meant to include all employees possibly covered in the text.  That is not the proper reading, and is contradicted by the plain words of the title of section 806 and

---

[12]  Our reading is entirely consistent with the principles of construction applied and the result reached in United States v. Ozuna-Cabrera, 663 F.3d 496 (1st Cir. 2011).  There we rejected an argument that the text "without lawful authority" in 18 U.S.C. § 1028A(a)(1) was equivalent to "without authorized permission" and that the defendant's construction was somehow supported by the statute's title: "Aggravated identity theft."  In Ozuna-Cabrera, the title was entirely consistent with our rejection of the defendant's more defendant-friendly construction.  In this case, the title and caption are even clearer in support of our reading.  Further, the text we considered in Ozuna-Cabrera provided no ambiguity which would have warranted resort to the rule of lenity, which is used only in criminal cases.

the caption of § 1514A(a). The title and caption are not ambiguous and their purpose in being there was not to add to any ambiguity in the text but to clarify. See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2336 (2008) (relying on subchapter's title -- "Postconfirmation matters" -- to undermine respondent's argument that a statute within that subchapter covered preconfirmation transfers); Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) (title of amendment, reinforced by its legislative history, clarified amendment's meaning). We do not think there is any ambiguity left. But if there were, other rules of statutory interpretation would lead us to the same result.

### 3. Other textual provisions of SOX

The choice by Congress to provide limited coverage in § 1514A(a) was not inadvertent, as shown by its choices elsewhere in SOX. Other provisions of SOX as of the time of enactment reinforce our view of the meaning of § 1514A(a) in several respects. Congress enacted only limited whistleblower protection in § 1514A(a). Where it wished to enact broader whistleblower protection elsewhere, it explicitly did so. But it chose different, more limited language for the coverage provision of § 1514A(a) than when it intended expanded coverage.

Congress also was explicit elsewhere than in its choice of language in § 1514A(a); where it intended to regulate non-public entities, it did not use language equivalent to the text of

-21-

§ 1514A(a).  It is also clear that Congress made choices about different regulatory mechanisms for different entities, and intended the coverage of § 1514A(a), which creates a private right of action, not to be so broad as to include employees of non-public companies.  For example, it subjected accountants and lawyers to different regulatory mechanisms.

First, when Congress intended to enact broader whistleblower protection in SOX itself in sections other than § 1514A, it did so clearly.  In Carnero, we described section 1107 of SOX as "[t]he other whistleblower provision found in [SOX]." 433 F.3d at 10; see also Glynn v. EDO Corp., 536 F. Supp. 2d 595, 616 (D. Md. 2008) (describing section 1107 as serving to "deter[] retaliation against whistleblowers").  Section 1107 is entitled "Retaliation Against Informants" and adds this language to 18 U.S.C. § 1513:

> (e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

SOX § 1107, 116 Stat. at 810 (emphasis added).  This language requires neither a public company, nor an employment relationship, nor a securities law violation to trigger coverage.  The scope of § 1514A(a) is, by contrast, conspicuously narrow.  See Barnhart v.

-22-

*Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) ("[W]hen 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello* v. *United States*, 464 U.S. 16, 23 (1983))).

Second, in other portions of SOX, where Congress intended separate provisions of the Act to apply to employees of private entities, it said so explicitly. By contrast, the title of section 806 and the caption of § 1514A(a) explicitly refer to publicly traded companies. SOX contains a number of provisions, described below, which directly and explicitly regulate the activities of entities other than publicly traded companies. Further, Congress expressly set up different regulatory schemes, which varied with the persons or entities involved. For example, Title I of SOX establishes the Public Company Accounting Oversight Board, which regulates "public accounting firms that prepare audit reports for issuers, brokers, and dealers." 15 U.S.C. § 7211(c)(1); see also id. §§ 7211-7220. Title II ensures the independence of outside auditors. See id. §§ 7231-7234.

In another example, section 307 of SOX directs the SEC to issue rules governing the professional conduct of attorneys -- both in-house and outside counsel -- who appear before it in the representation of issuers. See id. § 7245. Moreover, Title VI,

"Commission Resources and Authority," details the SEC's authority to censure or bar outside securities professionals from practice and defines conditions under which a person can be barred from practicing as a broker, investment adviser, or dealer. See id. §§ 78d-3, 78o, 80b-3.

Further, Title V, "Analyst Conflicts of Interest," defines codes of conduct for outside securities analysts and requires disclosures of conflicts of interest. See id. § 78o-6. And Title VII, "Studies and Reports," requires the Comptroller General and the SEC to perform various studies, including on securities violations by securities professionals, defined as "public accountants, public accounting firms, investment bankers, investment advisers, brokers, dealers, attorneys, and other securities professionals practicing before the Commission." SOX § 703(a)(1), 116 Stat. at 798.

Congress has been clear in SOX when it intends to regulate private entities and has been explicit. By contrast, the limited language within the text of § 1514A(a) and the title and caption show that Congress did not intend coverage to reach beyond employees of public companies. The Supreme Court has directed us to be particularly attentive to such language choices in interpreting the securities laws. See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176 (1994) (refusing to impose aiding and abetting liability under § 10(b) of

-24-

the 1934 Act because "Congress knew how to impose aiding and abetting liability when it chose to do so"); <u>Blue Chip Stamps</u> v. <u>Manor Drug Stores</u>, 421 U.S. 723, 734 (1975) (limiting Rule 10b-5 cause of action to actual purchasers and sellers of securities in part because "[w]hen Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly"); <u>SEC</u> v. <u>Tambone</u>, 597 F.3d 436, 444-45 (1st Cir. 2010) (en banc) (court must honor the differential draftsmanship of Congress).

Plaintiffs argue that surely Congress meant to cover all whistleblowers and their reading is required by Congress's purpose. Not so. These distinctions and differentiated approaches to multi-faceted problems drawn by Congress, including the coverage limitation in § 1514A(a) to public companies, are consistent with the problems which led to the enactment of SOX. Congress's primary concern in enacting SOX was not the activities of the advisers to mutual funds organized under the Investment Company Act, like the Fidelity funds here. Indeed, Congress knew that investment companies like the Fidelity mutual funds often do not have their own employees, but only a Board of Trustees, and are often advised and managed by private entities, like the defendants. <u>See</u> <u>Jones</u> v. <u>Harris Assocs. L.P.</u>, 130 S. Ct. 1418, 1422 (2010) ("A separate entity called an investment adviser creates the mutual fund, which may have no employees of its own."); <u>Burks</u> v. <u>Lasker</u>, 441 U.S. 471,

480-81 (1979); S. Rep. No. 91-184, at 4 (1969) (accompanying the Investment Company Amendments Act of 1970) ("Mutual funds, with rare exception, are not operated by their own employees. Most funds are formed, sold, and managed by external organizations, [called 'investment advisers,'] that are separately owned and operated."). And if they have no employees, they are not subject to § 1514A. This is not anomalous. Congress in the Investment Company Act deliberately created this separation between investment companies and their advisers.[13] See 15 U.S.C. § 80a-1(b)(2) (declaring as a policy rationale for the Investment Company Act the prevention of conflicts of interest between investment companies and advisers).

Had Congress intended to extend § 1514A whistleblower coverage protections to the employees of private companies that have contracts to provide investment advice to funds organized under the Investment Company Act, it would have done so explicitly

---

[13] Investment advisers and their employees are regulated by the securities laws, and they may be prosecuted for violations of these laws. See 15 U.S.C. § 80b-6 (making it unlawful for investment advisers to, among other things, defraud their clients or prospective clients). In fact, the SEC's study of violations of securities laws by securities professionals required by SOX section 703 demonstrates that the SEC has been active in prosecuting violations of securities laws by investment advisers. See SEC, Study and Report on Violations by Securities Professionals 6 (2003), available at http://www.sec.gov/news/studies/sox703report .pdf/ (finding that in SEC actions that reached finality between January 1, 1998, and December 31, 2001, 264 investment advisers or persons associated with investment advisers had been found to have violated securities laws).

in § 1514A(a) not only in the text of § 1514A(a), but also in the title and caption under which the text is found. Elsewhere in SOX, Congress did specifically address investment companies and investment advisers, and made it explicit when it intended coverage and when it did not. See, e.g., 15 U.S.C. § 7263 (exempting "investment compan[ies] registered under" section 8 of the Investment Company Act from certain SOX provisions); id. § 80b-3(e) (titled "Investment Advisers" and amending the Investment Advisers Act).

The broader reading of § 1514A(a) offered by plaintiffs would provide an impermissible end run around Congress's choice to limit whistleblower protection in that subsection to the employees of two categories of companies the title and caption call "publicly traded companies."

4.    SOX's reference to the Wendell H. Ford Aviation
      Investment and Reform Act for the 21st Century

The whistleblower protection provision of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), 49 U.S.C. § 42121, was a model for at least portions of the whistleblower protection provision of § 1514A, which incorporates the procedures and burden-shifting framework of AIR 21. See 18 U.S.C. § 1514A(b)(2)(A) ("An action under paragraph (1)(A) shall be governed under the rules and procedures set forth in section 42121(b) of title 49, United States Code."); id. § 1514A(b)(2)(C)

("An action brought under paragraph (1)(B) shall be governed by the legal burdens of proof set forth in section 42121(b) of title 49, United States Code.").

The legislative history of SOX also refers to AIR 21. See S. Rep. No. 107-146, at 30 (2002) (additional views of Sen. Hatch, et al.) (stating that an amendment to the bill containing eventual § 1514A made that provision "consistent with [AIR 21] in which we provided whistleblower protections to another class of non-government employees[;] . . . we thought it best to track those protections as closely as possible"). The tracking of these protections operates against plaintiffs' interpretation.

The pertinent section of AIR 21 is entitled "Protection of employees providing air safety information" and states that "[n]o air carrier or contractor or subcontractor of an air carrier may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)" engaged in protected whistleblowing activity. 49 U.S.C. § 42121(a) (emphasis added).[14]

There are several important differences between the whistleblower provision of AIR 21 and that of SOX, which operate

---

[14] See S. Rep. No. 105-278, at 22 (1998) (stating that the whistleblower protection of AIR 21 "would provide employees of airlines, and employees of airline contractors and subcontractors, with statutory whistleblower protection").

-28-

against plaintiffs' interpretation. The text of AIR 21 has greater clarity. Further, AIR 21 contains an inherent, textual limiting principle. It does not extend broadly to any contractor or subcontractor, instead § 42121 defines "contractor" to mean "a company that performs safety-sensitive functions by contract for an air carrier." Id. § 42121(e). This limitation on the term "contractor" excludes from coverage employees of all other contractors and subcontractors.

By contrast, plaintiffs' broader and unlimited construction of "employee" in § 1514A(a) would provide protection to employees of any contractor or subcontractor. It is true that AIR 21 explicitly went beyond employees of airlines, but only to employees of a limited class of contractors and subcontractors: those who perform "safety-sensitive functions." That limited expansion serves AIR 21's purpose of protecting the safety of travelers by focusing on those contractors and subcontractors responsible for safety. No such limitation is built into SOX or into plaintiffs' expansive reading. Defendants' reading, by contrast, is self-limited.

Second, the text of AIR 21 does not pose the interpretative problems posed by plaintiffs' proposed construction of § 1514A(a): excessive breadth and the extension of coverage to employees of employees and employees of officers. In § 1514A(a), Congress chose to employ different language from what it used in

-29-

§ 42121(a), undercutting plaintiffs' argument that because AIR 21 purportedly covers employees of contractors, so should § 1514A.

Further, in AIR 21, Congress did not consider the subject matter of the complaints -- air safety information -- to be an adequate limitation on the creation of whistleblower liability in the air carrier business, so it limited the definition of the relevant contractors. Congress did not in SOX consider the subject matter of the complaints to be the only limiting principle, nor to be sufficient in itself to narrow the range of contractors. The plaintiffs' reading is broader than Congress's intended reach.[15]

5.    Contrast with language of other whistleblower protection statutes

Our reading of § 1514A(a) stands on the text of SOX itself. If more were needed, we also find support in the contrast with whistleblower provisions in other statutes. In contrast with the language of § 1514A(a), we note two other, earlier, federal whistleblower protection statutes which explicitly extend coverage to employees of contractors to the entities regulated by those

---

[15] Because we conclude that the text of § 1514A(a) is unambiguous in limiting whistleblower protection to employees of public companies and reverse the district court, we do not reach a conclusion on the district court's proposed limiting principle. The district court stated that the phrase "relating to fraud against shareholders" in § 1514A(a)(1) modifies the entire clause "a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law". See Lawson, 724 F. Supp. 2d at 159-60. That proposed limiting principle addresses the scope of protected activity, not the scope of employee coverage.

statutes. That Congress was clear in extending coverage to employees of contractors in those statutes confirms our understanding of § 1514A(a) as not extending so far.

The Nuclear Whistleblower Protection provision of the Energy Reorganization Act, 42 U.S.C. § 5851(a)(1), states that "[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)" engaged in protected whistleblowing activity. The provision defines "employer" as, among other things, "a licensee of the [Nuclear Regulatory] Commission or of an agreement State under" the Atomic Energy Act of 1954, id. § 5851(a)(2)(A), "a contractor or subcontractor of such a licensee or applicant" for a license, id. § 5851(a)(2)(C), and "a contractor or subcontractor of the Commission," id. § 5851(a)(2)(E).

Similarly, the whistleblower protection provision of the Pipeline Safety Improvement Act of 2002, 49 U.S.C. § 60129(a)(1), states that "[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)" engaged in protected whistleblowing activity. That statute goes on to define "employer" as "a person owning or operating a pipeline

-31-

facility," id. § 60129(a)(2)(A), or "a contractor or subcontractor of such a person," id. § 60129(a)(2)(B).

The whistleblower protection provisions of both the Energy Reorganization Act and the Pipeline Safety Improvement Act are explicit in defining which entities and which of those entities' representatives are covered employers. We view the fact that Congress was not similarly explicit in extending coverage to the employees of contractors, subcontractors, and agents in § 1514A(a) as evidence that Congress did not intend such coverage to exist.

6.      Other canons of construction

Our reading of § 1514A is further confirmed by canons of construction mandated by Supreme Court opinions regarding both securities laws and the relationship between investment companies and their advisers.

The Court has admonished the lower federal courts not to give securities laws a scope greater than that allowed by their text.  See, e.g., Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 772 (2008) ("[T]he jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation." (quoting Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 17 (1951))); Pinter v. Dahl, 486 U.S. 622, 653 (1988) ("The ascertainment of congressional intent with respect to the scope of liability created by a particular section of the

Securities Act must rest primarily on the language of that section."). While many of these cases are in the context of the implied private right of action under § 10(b) of the 1934 Act, the rule that we are to "assume that Congress meant what it said" when it enacts legislation applies throughout the Code, including SOX. Pinter, 486 U.S. at 653.

Plaintiffs incorrectly argue that since the statute has some remedial purposes, those purposes must be as broad as plaintiffs say, and it must be assumed Congress chose the mechanism of a broad private right of action rather than other mechanisms to effectuate remedies. Plaintiffs essentially argue that the actual text must give way in favor of a broader reading to effectuate those broad remedial purposes. That is not the law. While the Court has stated that "securities laws combating fraud should be construed 'not technically and restrictively, but flexibly to effectuate [their] remedial purposes,'" Herman & MacLean v. Huddleston, 459 U.S. 375, 386-87 (1983) (quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963)), it has also admonished that "[t]he broad remedial goals of [a securities law] are insufficient justification for interpreting a specific provision 'more broadly than its language and the statutory scheme reasonably permit.'" Pinter, 486 U.S. at 653 (quoting Touche Ross & Co. v. Redington, 442 U.S. 560, 578 (1979)). Here, plaintiffs' reading is broader than the statutory scheme permits. Further, as

discussed later, plaintiffs' interpretation goes far beyond the problems Congress wished to remedy.

In Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), the Court held that the fact that an investment adviser to a mutual fund exercised significant influence over its client fund and prepared SEC prospectuses on behalf of the fund did not make the adviser subject to liability under SEC Rule 10b-5 for statements made in those prospectuses, despite the adviser's "uniquely close" relationship with the fund. The Court stated that the mutual fund (an investment company under the Investment Company Act of 1940) and the adviser (an investment adviser under the Investment Adviser Act of 1940) were "legally separate entities" and that "[a]ny reapportionment of liability in the securities industry in light of the close relationship between investment advisers and mutual funds is properly the responsibility of Congress and not the courts." Id. at 2304.

Although there is a close relationship between the private investment adviser defendants and their client mutual funds, as pointed out by the plaintiffs and the SEC as amicus curiae, the two entities are separate because Congress wanted it that way. Had Congress intended to ignore that separation and cover the employees of private investment advisers for whistleblower protections, it would have done so explicitly in § 1514A(a). However, it did not.

Finally, the rule of lenity has no place in our interpretation of § 1514A(a), for several reasons. Application of the rule of lenity is restricted to the interpretation of criminal statutes. Bifulco v. United States, 447 U.S. 381, 387 (1980) (The rule of lenity "applies . . . to interpretations of the substantive ambit of criminal prohibitions [and] . . . to the penalties they impose."). Section 1514A is not a criminal provision and imposes no criminal penalties; instead it provides for compensatory civil damages. 18 U.S.C. § 1514A(c). In addition to the inapplicability of the rule of lenity vel non, it would not apply here in any event because there is simply the lack of "grievous ambiguity" left after considering the text, structure, history, and purpose needed to invoke the rule. As the Supreme Court has recognized, "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended."[16] Barber v. Thomas, 130 S. Ct. 2499, 2508-09 (2010) (citation omitted) (quoting Muscarello v. United States, 524

---

[16] Furthermore, interpretative principles applied to immigration cases have no application here. Cf. INS v. St. Cyr, 533 U.S. 289, 320 (2001) (reciting "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien" (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987)) (internal quotation marks omitted)); INS v. Errico, 385 U.S. 214, 225 (1966) (stating that the Court resolved doubt in the interpretation of an immigration statute in favor of the alien "because deportation is a drastic measure and at times the equivalent of banishment or exile" (quoting Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948))).

U.S. 125, 139 (1998), and <u>Bifulco</u>, 447 U.S. at 387) (internal quotation marks omitted) (quoted in <u>United States</u> v. <u>Gerhard</u>, 615 F.3d 7, 22 (1st Cir. 2010)).

B.    <u>Legislative history</u>

Turning from the statutory language and principles of statutory interpretation which alone require us to reject plaintiffs' interpretation, we also confirm our understanding of the text by examining the legislative history.  <u>See</u> <u>Samantar</u> v. <u>Yousuf</u>, 130 S. Ct. 2278, 2287 & n.9 (2010) (using legislative history to confirm the Court's sense of a statute's plain meaning); <u>Phillips</u> v. <u>Pembroke Real Estate, Inc.</u> 459 F.3d 128, 143 n.12 (1st Cir. 2006).

1.    <u>Contemporaneous legislative history</u>

The contemporaneous legislative history consists of a May 6, 2002, Senate committee report for a bill containing what became § 1514A and statements in the Congressional Record by Senator Leahy, a sponsor of that bill.  We address each in turn.

The Corporate and Criminal Fraud Accountability Act of 2002, S. 2010, 107th Cong. (2002), was incorporated into SOX as Title VIII and contained the provision that would become § 1514A. The report of the Senate Judiciary Committee accompanying the Corporate and Criminal Fraud Accountability Act makes clear that Congress's primary concern was the Enron debacle, which involved the stock of a highly visible publicly traded company.  <u>See</u> S. Rep.

-36-

No. 107-146, at 2-5 (2002) (discussing Enron's collapse, its aftermath, and the need for reform).

The same committee report states that what became § 1514A "would provide whistleblower protection to employees of publicly traded companies," id. at 13, and that eventual § 1514A was intended to "provide whistleblower protection to employees of publicly traded companies who report acts of fraud to federal officials with the authority to remedy the wrongdoing or to supervisors or appropriate individuals within their company," id. at 18-19. These statements and others in the report accord with our interpretation. Only employees of publicly traded companies are mentioned; employees of private companies are not.

Senator Leahy stated that the provision that would eventually be codified as § 1514A "would provide whistleblower protection to employees of publicly traded companies who report acts of fraud," 148 Cong. Rec. S1787 (daily ed. Mar. 12, 2002) (pre-enactment statement), and that "[a]lthough current law protects many government employees who act in the public interest by reporting wrongdoing, there is no similar protection for employees of publicly traded companies who blow the whistle on fraud and protect investors," id. at S1788;[17] see also 149 Cong.

---

[17] In the same remarks, Senator Leahy stated more broadly that "[o]ur laws need to encourage and protect those who report fraudulent activity that damages investors in publicly traded companies." 148 Cong. Rec. S1788 (daily ed. Mar. 12, 2002). Plaintiffs contend that this statement supports a broad reading of

Rec. S1725 (daily ed. Jan. 29, 2003) (statement of Sen. Leahy) (post-enactment) (§ 1514A "was intentionally written to sweep broadly, protecting any employee of a <u>publicly traded company</u> who took such reasonable action to try to protect investors and the market").

Plaintiffs point to the committee report's background discussion as supporting their position. The report decries retaliation against whistleblowers at Enron, a publicly traded company. <u>See</u> S. Rep. 107-146 at 4-5. But the report also discusses retaliation against employees at Arthur Andersen, a private entity which was both a consultant to Enron and its "independent" auditor. <u>See</u> <u>id.</u> at 3. The report states that "[i]n a variety of instances . . . corporate employees at both Enron and Andersen attempted to report or 'blow the whistle' on fraud, but they were discouraged at nearly every turn." <u>Id.</u> at 4-5. The report also cites the fact that an "Andersen partner was apparently removed from the Enron account when he expressed reservations about the firm's financial practices in 2000" as an "example" of "a culture, supported by law, that discourage[d] employees from reporting fraudulent behavior." <u>Id.</u> at 5.

---

the statute: if the point of § 1514A is to protect investors in publicly traded companies, then it makes sense that the statute would protect whistleblowers who report fraud at such companies, even if a whistleblower is the employee of such a company's contractor or agent. We disagree that Congress meant to cast so broad a net.

Congress's concern about Arthur Andersen was addressed by special provisions as to accountants. See SOX tit. I, 116 Stat. at 750-71 ("Public Company Accounting Oversight Board"); SOX tit. II, 116 Stat. at 771-75 ("Auditor Independence"). The committee's concerns regarding the integrity and independence of accountants and auditors are addressed in SOX by virtue of these provisions, and not by an expansive definition of "employee" in § 1514A(a).

2.        Post-enactment legislative activity

After SOX's enactment, there have been two relevant attempts to amend the Act, one successful, the other not. As the Court said in North Haven Board of Education v. Bell, 456 U.S. 512 (1982), "[a]lthough postenactment developments cannot be accorded 'the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of'" previous enactments. Id. at 535 (quoting Cannon v. Univ. of Chi., 441 U.S. 677, 686 n.7 (1979)); see also Goncalves v. Reno, 144 F.3d 110, 133 (1st Cir. 1998) ("[S]ubsequent legislative developments, although never determinative in themselves, can be 'significant' clues to congressional intent." (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 430 (1987))).

We turn to the failed effort to expand the term "employee" in § 1514A(a).[18] In 2004, Senator Fitzgerald introduced

---

[18] We acknowledge that "failed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'" United States v. Craft, 535 U.S. 274, 287

-39-

in the Senate a bill entitled the Mutual Fund Reform Act of 2004 (MFRA).  S. 2059, 108th Cong. (2004).  Section 116(b) of MFRA would have amended § 1514A(a) to explicitly cover employees of investment advisers to mutual funds.  As amended by MFRA, § 1514A(a) would have read:

> Whistleblower Protection for Employees of Publicly Traded Companies <u>and Registered Investment Companies</u> -- No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), <u>or that is an investment adviser, principal underwriter, or significant service provider (as such terms are defined under section 2(a) of the Investment Company Act of 1940 (15 U.S.C. 80a-2(a)) of an investment company which is registered under section 8 of the Investment Company Act of 1940</u>, or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee–

(2002) (quoting <u>Pension Benefit Guar. Corp.</u> v. <u>LTV Corp.</u>, 496 U.S. 633, 650 (1990)).  However, the Court has used failed attempts to amend statutory language as aids to understanding Congress's intent.  <u>See,</u> <u>e.g.,</u> <u>FDA</u> v. <u>Brown & Williamson Tobacco Corp.,</u> 529 U.S. 120, 144 (2000) ("Congress considered and rejected bills that would have granted the FDA" jurisdiction to regulate tobacco.); <u>N. Haven Bd. of Educ.</u> v. <u>Bell</u>, 456 U.S. 512, 534 (1982) ("Congress has refused to pass bills that would have amended § 901 to limit its coverage of employment discrimination.").

S. 2059, 108th Cong. § 116(b) (emphasis added). MFRA was referred to the Senate Committee on Banking, Housing, and Urban Affairs, but it was never reported out of that committee.[19]

Defendants argue that MFRA is evidence that Congress did not believe § 1514A(a) covered employees of private contractors to public companies; if it did, then MFRA's amendment would have been superfluous. We are more cautious, because there is no statement in MFRA's legislative history regarding its sponsors' understanding of section 116(b) or of § 1514A(a).[20] Cf. Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 596 (1980) (considering legislative history discussing why Congress chose to amend a certain provision in one way but not another, and stating "while the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, such views are entitled to significant weight" (citations omitted)). The Supreme Court has stated that "[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction,

---

[19] MFRA was also introduced in the House in 2004 as H.R. 4505 and referred to the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises. It was never reported out of that subcommittee.

[20] The only statements regarding MFRA's whistleblower protection amendment in the Congressional Record are general. See, e.g., 150 Cong. Rec. S794 (daily ed. Feb. 10, 2004) (statement of Sen. Fitzgerald) ("[MFRA] puts the interests of investors first by: . . . instituting Sarbanes-Oxley-style provisions for independent accounting and auditing, codes of ethics, chief compliance officers, compliance certifications, and whistleblower protections.").

-41-

including the inference that the existing legislation already incorporated the offered change." Craft, 535 U.S. at 287 (alteration in original) (quoting Cent. Bank of Denver, N.A., 511 U.S. at 187) (internal quotation marks omitted).  At most, this is a clue, but far from conclusive.

Later, Congress did amend § 1514A(a).  In 2010 the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) amended § 1514A by explicitly extending whistleblower coverage to employees of public companies' subsidiaries and employees of statistical rating organizations.  Section 1514A(a) as amended by Dodd-Frank reads:

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee–

18 U.S.C. § 1514A(a), as amended by Pub. L. No. 111-203 §§ 922(b), 929A, 124 Stat. 1376, 1848, 1852 (2010) (emphasis added).

The report of the Senate Committee on Banking, Housing, and Urban Affairs accompanying Dodd-Frank explains that section 929A of that Act amended § 1514A(a) "to make clear that subsidiaries and affiliates of issuers may not retaliate against whistleblowers."  S. Rep. No. 111-176, at 114 (2010).  The committee believed such a clarification was necessary because "[t]he language of [§ 1514A(a)] may be read as providing a remedy only for retaliation by the issuer, and not by subsidiaries of an issuer."  Id.[21]

Furthermore, Senator Cardin, in remarks introducing an amendment to Dodd-Frank that became section 922(b) of that Act, explained that "Section 1514[A] delineates which companies are covered by [SOX] and what actions are prohibited.  The Cardin-Grassley amendment expands the provision to include employees of the rating companies."  156 Cong. Rec. S3349 (daily ed. May 6, 2010).  In the course of these remarks, Senator Cardin characterized § 1514A(a) as enacted by SOX as

> extend[ing] whistleblower protections to employees of any company that is registered under the SEC Act of 1934 or that is required to file reports under section 15(d) of the

_____

[21] As described later, the fact that DOL had issued what were non-substantive procedural regulations says nothing about congressional intent in SOX, enacted years earlier.  That fact also is irrelevant to the Dodd-Frank amendments because Congress said its concern was to clarify § 1514A(a), and it said nothing about a regulation from DOL, much less one that did not and could not purport to provide a substantive interpretation of the SOX language at issue.

same act. The whistleblower provisions of the Sarbanes-Oxley Act protect employees of the publicly traded companies from retaliation by giving victims of such treatment a cause of action which can be brought in Federal court.

Id. Notably, Senator Cardin's statement again confirms that the covered employees are only those of publicly traded companies.

Dodd-Frank's successful amendments of § 1514A(a) are not subject to the rule of judicial wariness about legislative inaction. Rather, these later actions by Congress are entitled to some weight as an expression of Congress's understanding of § 1514A(a)'s meaning, which is consistent with our interpretation.

III.

No Deference Owed to Agency Positions

Congress chose not to give authority to the SEC or the DOL to interpret the term "employee" in § 1514A(a). So there is no basis for Chevron deference. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984). Because the term "employee" in § 1514A(a) is not ambiguous, we would not defer to an administrative agency's contrary determination, even had Congress delegated authority to the agency. See Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 127 S. Ct. 2518, 2534 (2007) ("[D]eference is appropriate only where 'Congress has not directly addressed the precise question at issue' through the statutory text." (quoting Chevron, 467 U.S. at 843); Saysana v. Gillen, 590 F.3d 7, 16 (1st Cir. 2009) (because statutory language

before the court "is unambiguous, there is nothing for the agency to interpret -- no gap for it to fill -- and there is no justification for resorting to agency interpretation to address an ambiguity"); Succar v. Ashcroft, 394 F.3d 8, 22-24 (1st Cir. 2005) (declining to defer to agency's interpretation of statute where statute's text is clear).

Here, independently, no deference is owed for the other reasons we discuss. The DOL, supported by the SEC, makes a threefold argument in favor of plaintiffs' interpretation. First, as to the particular OSHA regulations regarding coverage under § 1514A(a), the Secretary of Labor admits these regulations are entitled to no deference, and the defendants agree, for the reasons we state below.[22] OSHA has promulgated regulations regarding § 1514A in its capacity as the body with delegated authority to

_____

[22] We accepted in dicta in Day v. Staples, Inc., 555 F.3d 42, 54 & n.7 (1st Cir. 2009), that certain DOL regulations concerned with a two-part test for what constituted "reasonable belief" under SOX were entitled to Chevron deference. That test was also contained in the relevant case law. Day did not concern the issue here, nor the regulation relied on here. That statement in Day was not necessary to the holding in that case but was rather dicta, nor was the holding in the case concerned with the precise regulations at issue here. Day is easily distinguishable, and that dicta in Day is not binding on this panel. Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003).
    Beyond that, the Secretary of Labor has disclaimed Chevron deference for the regulations at issue. In addition, the notice of final rulemaking promulgating them states that the procedural regulations are "not intended to provide statutory interpretations." 69 Fed. Reg. 52104, 52105 (Aug. 24, 2004).

enforce its provisions.[23] These regulations purport to "implement[] procedures under section 806" of SOX, 29 C.F.R. § 1980.100(a) (2009), and they construe § 1514A(a)'s coverage provisions in plaintiffs' favor, see id. § 1980.101-.102.[24]

These regulations, id., are not entitled to Chevron deference, as the Secretary admits. See Chevron, 467 U.S. at 842-43. In addition, in promulgating the rules, the DOL made it clear the rules were not interpretations of the Act. In the notice of

---

[23] Section 1514A delegates to the Secretary of Labor the authority to enforce the statute through formal adjudication. See 18 U.S.C. § 1514A(b)(1) ("A person who alleges discharge or other discrimination by any person in violation of subsection (a) may seek relief under subsection (c) by . . . filing a complaint with the Secretary of Labor . . . ."). The Secretary delegated enforcement responsibility for § 1514A to the Assistant Secretary of Occupational Health and Safety, see 67 Fed. Reg. at 65,008, and review of decisions by ALJs to the DOL's ARB, see 67 Fed. Reg. at 64,272-73.

[24] The regulations in effect at the pertinent times in this case state that
> "[n]o company or company representative may discharge, demote, suspend, threaten, harass or in any other manner discriminate against any employee with respect to the employee's compensation, terms, conditions, or privileges of employment because the employee, or any person acting pursuant to the employee's request, has engaged in any of the activities specified in paragraphs (b)(1) and (2) of this section."

29 C.F.R. § 1980.102(a) (2009). The regulations define "company representative" to mean "any officer, employee, contractor, subcontractor, or agent of a company," id. § 1980.101, and "employee" to mean "an individual presently or formerly working for a company or company representative, an individual applying to work for a company or company representative, or an individual whose employment could be affected by a company or company representative," id.

final rulemaking promulgating these regulations, OSHA repeatedly states that "[t]hese rules are procedural in nature and are not intended to provide interpretations of the Act." 69 Fed. Reg. 52,104, 52,105 (Aug. 24, 2004). In this case, the DOL has explicitly stated that "[t]he Department of Labor does not have substantive rulemaking authority with respect to section 1514A" and thus the Secretary of Labor does not seek Chevron deference "for her procedural regulations."

We also conclude that these particular OSHA regulations are not entitled to Skidmore deference for several reasons, including that the text of the statute does not permit even that level of deference. See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). Congress has made the choice and not given the agency a role. Further, "the Skidmore standard entails . . . a sliding-scale approach under which the degree of deference accorded to an agency interpretation hinges on a variety of factors, such as 'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and the] consistency [of its interpretation] with earlier and later pronouncements.'" Doe v. Leavitt, 552 F.3d 75, 81 (1st Cir. 2009) (alterations in original) (quoting Skidmore, 323 U.S. at 140). Moreover, as the Supreme Court has stated, an agency's statutory "interpretation is 'entitled to respect' only to the extent it has the 'power to persuade.'" Gonzales v. Oregon, 546 U.S. 243, 256 (2006) (quoting

-47-

_Skidmore_, 323 U.S. at 140). The notice of final rulemaking here contains no reasoning to support OSHA's construction of the coverage provisions of § 1514A(a), saying only that "OSHA believes that [its regulations] accurately reflect the statutory language." 69 Fed. Reg. at 52,105-06. OSHA's reading, which it states is not a statutory interpretation, lacks the "power to persuade." We also note that the DOL's amicus brief does not argue that these particular OSHA regulations should be accorded _Skidmore_ deference, nor does the SEC.

Second, if there were an on-point holding of the ARB, it might be entitled to some deference as to any ambiguity in the statute. The point is irrelevant for two reasons. First, we find no ambiguity, so no deference is owed. _Cf._ _Welch_ v. _Chao_, 536 F.3d 269, 276 n.2 (4th Cir. 2008) (according deference to a decision of the ARB interpreting § 1514A because the statute expressly delegated to the Secretary of Labor authority to enforce the statute by formal adjudication and the Secretary delegated that power to the ARB). Second, there is in any event no ARB decision on point,[25] and the ALJ in the Zang case, at the level below the

---

[25] In _Johnson_ v. _Siemens Building Technologies, Inc._, the complainant brought a claim of retaliation under § 1514A against her employer, a subsidiary of a publicly traded company. The ARB disposed of the case by holding that § 1514A(a) as enacted by SOX covered employees of subsidiaries of public companies. In dicta to which no deference could be owed, the ARB stated that SOX's "legislative history demonstrates that Congress intended to enact robust whistleblower protections for more than employees of publicly traded companies." 2011 WL 1247202, at *12.

ARB, reached a conclusion consistent with ours.  See Zang, 2008 WL 7835900.

We have considered the arguments in the amicus briefs of the DOL and SEC, but we owe no deference to the positions stated there.  The SEC has no rulemaking or enforcement authority as to § 1514A, so its interpretation of that provision, in any form, would be owed no deference in any event.  See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 143-44 (2002); FLRA v. U.S. Dep't of the Navy, 941 F.2d 49, 55 (1st Cir. 1991).  The arguments advanced by the DOL, which does have authority to enforce § 1514A, see 18 U.S.C. §§ 1514A(b)(1), 1514A(b)(2)(A); 49 U.S.C. § 42121(b), mirror the textual arguments of the plaintiffs and are not based on the DOL's "specialized experience."  Skidmore, 323 U.S. at 139.  In addition, we view the text of § 1514A(a) as clear.

IV.

## Conclusion

If we are wrong and Congress intended the term "employee" in § 1514A(a) to have a broader meaning than the one we have arrived at, it can amend the statute.  We are bound by what Congress has written.

Reversed and remanded with instructions to dismiss the actions.  No costs are awarded.


**-- Dissenting Opinion Follows --**

-49-

THOMPSON, **Circuit Judge**, **dissenting**.  Because my colleagues impose an unwarranted restriction on the intentionally broad language of the Sarbanes-Oxley Act, employ a method of statutory construction diametrically opposed to the analysis this same panel employed just weeks ago, take pains to avoid paying any heed to considered agency views to which circuit precedent compels deference, and as a result bar a significant class of potential securities-fraud whistleblowers from any legal protection, I dissent.

Accepting the allegations in the complaint as true, plaintiffs Lawson and Zang are ex-employees of private companies that contract to advise or manage the publicly held Fidelity-brand mutual funds.  The mutual funds themselves have no employees.  Both plaintiffs blew the whistle on putative fraud by the mutual funds, and both were fired (actually or constructively) by their employers.

The Sarbanes-Oxley Act purports to protect securities-fraud whistleblowers. Specifically, § 806 of the Act provides that "[n]o company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in

any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee" to report activity the employee reasonably suspects to be securities fraud.  18 U.S.C. § 1514A(a) (prior to amendment by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010).

For present purposes, it is undisputed that the Fidelity mutual funds fall under § 806, that the plaintiffs' employers contracted with the Fidelity mutual funds, and that the plaintiffs' employers discharged the plaintiffs — their employees.  In other words, in each case a "contractor . . . of such company . . . discharge[d] . . . an employee."  Id.  One might think our inquiry would end here: Sarbanes-Oxley's whistleblower-protection provision by its terms applies.  According to the majority, however, one would be incorrect.

The majority engage in a faulty statutory-interpretation exercise, one whose wrongness is perhaps best highlighted through contrast with our recent decision in United States v. Ozuna-Cabrera, 663 F.3d 496 (1st Cir. 2011).  In Ozuna-Cabrera, we held that application of the "Aggravated Identity Theft" statute is not restricted to situations involving traditional theft.  Id. at 501.  This is how our analysis went:

First, we looked to the plain language of the statute and noted that it contained no restriction limiting the statute's application to situations involving theft.  Id. at 498-99.

-51-

Instead, the statute contained only the broad phrase "without lawful authority." Id. Second, we looked to the statutory framework, noting that the phrase "without lawful authority" was used in the statutes criminalizing both identity fraud and aggravated identity theft. Id. at 499. Because identical language appeared in both, related statutes, only one of which referenced theft at all (albeit in the title), we deemed it unlikely that Congress intended the phrase to import the elements of common-law theft. Id. Third, in a footnote, we looked to the statutory title (which, again, referenced theft) and noted that "we do not rely on the titles of statutory enactments in plumbing their meaning . . . at the expense of the text itself." Id. at 499 n.3 (internal quotation marks removed). We also noted that it was by no means clear that the word "theft" in the title was intended to limit the effective language of the statute. Id. (citing United States v. Godin, 534 F.3d 51, 59 (1st Cir. 2008)). Fourth and finally, we looked at legislative history and noted that implicitly restrictive references to "theft" could not limit the scope of broad statutory language. Id. at 500. More specifically, nothing in the legislative history explicitly suggested "that Congress intended to so narrowly restrict the statute's reach." Id. Instead, the legislative history "demonstrate[d] that Congress intended [the statute] to address a wide array of" conduct. Id. Applying this

same analysis to the present case produces a very different result than the one the majority reach.

First, looking to the plain language of the statute, one can only conclude that there is no restriction limiting the statute's application to employees of publicly held companies.[26] As I have already pointed out, boiling the statute down to its relevant syntactic elements, it provides that "no . . . contractor . . . may discharge . . . an employee."  18 U.S.C. § 1514A(a).  The statute does not limit its coverage to "an employee of a publicly held company" — it just refers broadly to "an employee."

In fact, the majority's interpretation offends a longstanding rule of statutory interpretation, violating the statutory language by rendering the word "contractor" in the statute superfluous.  See, e.g., United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985) (providing that "no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous").  The majority suggest that the word "contractor" might be intended only to refer to so-called "ax-wielding specialists" that public companies bring

---

[26]  In addition to our own recent decision in Ozuna-Cabrera, a days-old Supreme Court decision has just reaffirmed the impropriety of imposing extra-textual limitations on statutes: where "[t]here is no indication in the text . . . that the [statute] excludes [particular] workers from . . . coverage," the reasonable conclusion is "that Congress did not limit the scope of [the statute]'s coverage."  Pac. Operators Offshore, LLP v. Valladolid, No. 10-507, 2012 WL 75045, at *8 (U.S. Jan. 11, 2012).

in to lay off employees.  Maj. Op. 17 n.11; see also Fleszar v. U.S. Dept. of Labor, 598 F.3d 912, 915 (7th Cir. 2010) (employing the term "ax-wielding specialist" and providing the example of "the character George Clooney played in 'Up in the Air'").  If that is indeed the case, it is a mystery why Congress did not say so specifically.  But more importantly for present purposes, when ax-wielding specialists actually fire public-company employees they are acting as agents (rather than mere contractors) of the public company.  And § 806 specifically lists agents as covered entities, just like contractors.  The word "contractor," therefore, must be doing something else.  In the end, then, not only do the majority impose extratextual limitations on § 806, but they also effectively evict the word "contractor" from the statute.[27]  This is simply wrong.  See Ven-Fuel, 758 F.2d at 751-52.

Second, looking to the statutory framework, one sees that Congress explicitly enacted narrower whistleblower protection elsewhere in Sarbanes-Oxley, that Congress was explicit where it intended to regulate public entities only, and that Congress's choices about different mechanisms for different entities support the plaintiffs' reading of the Act.  Cf. Maj. Op. 21-22 (noting that Congress explicitly "enact[ed] broader whistleblower

---

[27]  The majority state correctly that their interpretation does not render superfluous the phrase "officer, employee, contractor, subcontractor, or agent of such company" — but that is not my point.  Maj. Op. 16.  My point, which remains unrebutted, is that their interpretation renders superfluous the word "contractor."

protection elsewhere . . . was explicit . . . where it intended to regulate non-public entities . . . [and] made choices about different regulatory mechanisms for different entities").

An example of Congress's enactment of narrower whistleblower protection appears in Sarbanes-Oxley § 501, which bars "a broker or dealer and persons employed by a broker or dealer" from retaliating against "any securities analyst employed by that broker or dealer or its affiliates." 15 U.S.C. § 78o-6(a)(1)(C). Congress could have similarly narrowed the definition of "employee" in § 806, but it chose not to do so. We should honor that choice.[28] Limone v. United States, 579 F.3d 79, 105 (1st Cir. 2009); see also Pac. Operators, 2012 WL 75045, at *6 ("Congress' decision to specify, in scrupulous detail, exactly where the other subsections of § 1333 apply, but to include no similar restriction . . . in § 1333(b), convinces us that Congress did not intend" to so limit § 1333(b).).

An example of Congress's specific reference to publicly held companies appears in § 806 itself. Section 806 specifically invokes companies "with a class of securities registered under

---

[28] Moreover, the majority's contrary example of broader whistleblower protection elsewhere in Sarbanes-Oxley is wrong. Not only is the referenced provision (§ 1107, enacted at 18 U.S.C. § 1513) actually narrower than § 806 in some respects — for example, it covers whistleblowing only to police, not to work supervisors — but it also does nothing to protect whistleblowers. In essence, it is nothing more than a criminal obstruction-of-justice statute targeted at wrongdoers, not a whistleblower-protection statute targeted at the wronged.

section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*)" or "required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d))." The section goes on to list a number of other covered entities, including contractors. It also uses the modifier "of such companies" at one point to refer to, e.g., contractors, but notably not to refer to employees. In fact, the section does not limit the word "employees" in any way. Again, we should honor Congress's choice to employ broad language. Limone, 579 F.3d at 105.

And the majority's own examples of Congress's electing to apply different mechanisms to different entities highlight the correctness of a broad reading of § 806. The majority note that "[e]lsewhere in SOX, Congress did specifically address investment companies and investment advisers." Maj. Op. 27. The first example they look to is a provision that exempts investment entities (including mutual funds and mutual fund advisers) from certain, specific requirements of the Act. See 15 U.S.C. § 7263. No such exemption appears in § 806, and the absence of an exemption surely suggests that Congress intended to protect the employees of mutual fund advisers.[29] The majority's second example — 15 U.S.C. § 80b-3 — deals with the "Registration of investment advisers" and says nothing of whistleblowers. Maj. Op. 27. The existence of a

_____

[29] Indeed, as the majority note, Congress "made it explicit when it intended coverage and when it did not." Maj. Op. 27 (emphasis added).

-56-

section tailored to investment advisers hardly exempts such entities from Sarbanes-Oxley's broader provisions — like § 806. After all, Congress knew how to exempt investment entities when it wanted to do so.  See 15 U.S.C. § 7263.

Third, the statute's title and caption do not compel a limited reading of its language; instead, the majority's strained reading comes "at the expense of the text itself."  Ozuna-Cabrera, 663 F.3d at 499 n.3.  I have already explained how nothing in either the text or the context of § 806 actually supports the limitation conjured by the majority.  A few words in a title are not sufficient to change that rock-solid fact.  That insufficiency is especially glaring where, as here, the title does not purport to apply any explicit limitations (e.g., "whistleblower protection for employees of pubic companies only") but merely describes a specific and common application of a more generally applicable statute.[30] Cf. Ozuna-Cabrera, 663 F.3d at 500 ("aggravated identity theft" may commonly apply to "criminals who actually steal other people's identities," but this is only one application of a broad statute). Under Ozuna-Cabrera and other circuit precedent, see, e.g., Mass. Ass'n of Health Maint. Orgs. v. Ruthardt, 194 F.3d 176, 180 (1st Cir. 1999), the title gets the majority nowhere.

---

[30]  I repeat: the title contains no "explicit guides to the limits" on § 806.  Maj. Op. 18.

Fourth, nothing in the legislative history of Sarbanes-Oxley indicates congressional intent to limit whistleblower protection to employees of public companies. Instead, the legislative history all refers positively to extending whistleblower protection in order to encourage the reporting of securities fraud.

According to Sarbanes-Oxley's Senate conference report (Section I, titled "PURPOSE") a key purpose of the chapter that includes § 806 is "to protect whistleblowers who report fraud against retaliation by their employers." S. Rep. No. 107-146, at *1 (2002). There is no mention of any limitation on which employers are covered. The breadth of this specific purpose comports with the Act's overall purpose: "to prevent and punish corporate and criminal fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions." Id. Indeed, this very court has endorsed a broad understanding of the Act's purpose, noting that "[t]he § 1514A whistleblower provision thus serves to 'encourage and protect [employees] who report fraudulent activity that can damage innocent investors in publicly traded companies'" and that "[i]t also aimed 'to provide federal protection to private corporate whistleblowers.'" Day v. Staples, Inc., 555 F.3d 42, 52 (1st Cir. 2009) (alteration in original) (quoting S. Rep. No. 107-146, at *17 (2002), and Carnero v. Bos. Scientific Corp., 433 F.3d 1, 11 (1st

Cir. 2006)).  Again, extending whistleblower protection to employees of contractors fits both with the specific whistleblower-protection purpose of Sarbanes-Oxley and with its broader anti-fraud purpose.

Moreover, none of the legislative history the majority rely on actually evidences any congressional intent to <u>limit</u> the scope of § 806's whistleblower protection.  All of the statements the majority highlight denote intent to protect employees of publicly traded companies.  <u>See</u> Maj. Op. 37-38.  Such protection is a wholly uncontroversial and undisputed effect of § 806.[31]  The question is whether protection is limited to employees of public entities only.  And none of the majority's sources — indeed, no source at all — expresses any intent to restrict § 806 so narrowly.[32]  <u>Cf.</u> <u>Ozuna-Cabrera</u>, 663 F.3d at 500 ("Without question,

_____

[31] Also uncontroversial and undisputed is the majority's discussion in its "Legislative History" section of Congress's addressing "concern about Arthur Andersen" with "special provisions as to accountants."  Maj. Op. 39.  In addition to being uncontroversial and undisputed, however, Sarbanes-Oxley's special provisions as to accountants are irrelevant here.

[32] The majority's reference to Senator Cardin's statement is a textbook example of their imputing an intent to limit where none is evident.  Specifically, Senator Cardin's statement says that "[t]he whistleblower provisions of the Sarbanes-Oxley Act protect employees of the publicly traded companies," 156 Cong. Rec. S3349 (daily ed. May 6, 2010); the majority say this statement "confirms that the covered employees are <u>only</u> those of publicly traded companies." Maj. Op. 44 (emphasis added). As I point out above, the word "only" would indeed indicate limiting intent — if it appeared in Senator Cardin's statement (or, for that matter, in absolutely any relevant legislative materials whatsoever). But it does not, so neither does any limiting intent.

Congress harbored concerns over criminals who actually steal other people's identities. There is nothing to suggest, however, that Congress intended to so narrowly restrict the statute's reach."). It is strange that the same circumstance — lack of congressional intent to limit broad statutory language — could cut so differently in two different cases.

And the majority's reliance on subsequent legislative history is entirely misplaced. Not only does their reading of the whistleblower provision's subsequent amendment defy their own faulty logic, but they also ignore the administrative backdrop against which Sarbanes-Oxley was amended by Dodd-Frank.

On the first point, the majority's read of Dodd-Frank defeats their overall conclusion as a matter of simple grammar. On the one hand, they say that the phrase (from 18 U.S.C. § 1514A) "No [public company], or any . . . contractor . . . of such company, may discharge . . . an employee" does not extend protection to employees of contractors. On the other hand, they say that the phrase (from the same section, post-Dodd-Frank) "No [public company] . . . or nationally recognized statistical rating organization . . . may discharge . . . an employee" does apply to employees of ratings companies. Maj. Op. 42 (noting that Dodd-Frank "explicitly extend[ed] whistleblower coverage to . . . employees of statistical rating organizations"). In these phrases, "contractor" and "rating organization" are syntactic equivalents

and should therefore be given equal effect.  The statute plainly protects <u>both</u> employees of contractors <u>and</u> employees of rating companies.

As to the majority's ignoring the administrative backdrop, let us start with the well-settled proposition that the courts, when construing a statute, assume that at the time of the statute's enactment, Congress was aware of courts' and agencies' interpretations of existing law.  <u>Lorillard</u> v. <u>Pons</u>, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").  At the time of Dodd-Frank, the Department of Labor (which is statutorily tasked with administratively adjudicating § 806 whistleblower claims, <u>see</u> 18 U.S.C. § 1514A(b)(1)) had issued notice-and-comment regulations explicitly providing that § 806 applied to employees of contractors of public companies.  29 C.F.R. § 1980.101 (2009) (defining "employee" as "an individual presently or formerly working for a company or company representative" and "company representative" as, e.g., "any . . . contractor . . . of a company").  In enacting Dodd-Frank in 2010, then, Congress had a miles-wide opening to nip Labor's regulation in the bud if it had wished to do so.  It did not.  To the (very limited) extent subsequent legislative history tells us anything here, it tells us that the majority are incorrect.

So if circuit precedent has any kind of methodological value then the majority go about things exactly backwards in this case. To reiterate: contrary to this panel's analysis in <u>Ozuna-Cabrera</u>, the majority ignore the text of § 806, take a myopic view of the section's context, wrongly inflate the section's title into operative law, and attribute a limiting intent to legislative history that in reality supports a broad reading of the statute. Again, the majority are wrong.[33]

To the extent the majority rely on analogous statutes, they get that wrong, too. There is indeed evidence that Sarbanes-Oxley was based in part on the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR"). <u>See</u> S. Rep. 107-146, at *26 (2002). The relevant provision of AIR is entitled "Discrimination against airline employees," and reads, "[n]o air carrier or contractor or subcontractor of an air carrier may

_____

[33] The majority's result seems to be driven by § 806's "very broad coverage." Maj. Op. 17. But very broad coverage was the precise goal of § 806. <u>See</u> Maj. Op. 37 n.17 (considering legislative history supporting broad whistleblower coverage, then rejecting that history by ipse dixit). The majority also refer obliquely to "anomalies" that would occur if we were to give § 806 the broad scope Congress intended; however, they never identify what those "anomalies" are. Maj. Op. 17. I, for one, can discern no "anomalies" in a determination that § 806 protects whistleblowers against retaliation by their employers. If the majority consider anomalous the unlikely scenario where an employee of, say, office superstore Staples manages to spot and report securities fraud in the course of, say, printing and binding a public company's financial reports, I see no reason why that employee should not be a protected whistleblower as a matter of either law or policy.

discharge an employee or otherwise discriminate against an employee." 49 U.S.C. § 42121(a). This structure perfectly parallels § 806's: "[n]o company . . . or any . . . contractor [or] subcontractor . . . of such company, may discharge . . . or in any other manner discriminate against an employee." Just as in § 806, AIR does not specify whether it protects employees of carriers only or whether it protects employees of contractors and subcontractors as well. The majority conclude that AIR protects employees of carriers, contractors, and subcontractors, but that § 806 protects only employees of public companies, primarily because — in the majority's view, notwithstanding the broad language passed by the legislative branch and the considered interpretation of the executive branch — § 806 would be excessively broad.[34] Maj. Op. 28-29. This is judicial overreaching of the highest order.[35]

---

[34] AIR, according to the majority, is not _excessively_ broad because it includes a subsection that narrowly defines "contractor." But the majority's reliance on AIR's narrower provision as the example proving that § 806's apparently broader provision is actually narrower than AIR's is a logical Escher stairway — it's just as nonsensical as it sounds. That AIR has a limiting definition means AIR is narrow. That § 806 has no limiting definition means § 806 is broad. Logic and grammar preclude any contrary conclusion. And the same reasoning demonstrates that the majority cannot properly rely on analogous whistleblower statutes that include limiting definitions. See Maj. Op. 31-32 (discussing the Energy Reorganization Act, 42 U.S.C. § 5851(a)(1), and the Pipeline Safety Improvement Act, 49 U.S.C. § 60129(a)).

[35] Indeed, during this appeal's pendency, the Supreme Court has again reaffirmed the impropriety of judges' limiting the scope of a statute's coverage for policy reasons: "'[I]f Congress' coverage decisions are mistaken as a matter of policy, it is for

Other basic principles of statutory interpretation support a broad reading of § 806 and undermine the majority's reasoning. These principles are: (1) that we broadly interpret remedial statutes; (2) that we narrowly interpret criminal and immigration statutes; and (3) that we presume a statute will not create a right of action by implication. The relevance of these principles here is not immediately apparent, so I will explain.

First, courts generally adhere to the principle that "[r]emedial statutes are liberally construed to suppress the evil and advance the remedy." 3 Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 60:1 (7th ed. 2010); accord Dudley v. Hannaford Bros. Co., 333 F.3d 299, 307 (1st Cir. 2003) (citing Tcherepnin v. Knight, 389 U.S. 332, 336 (1967)). It should be achingly clear at this point that § 806 is remedial in nature; specifically, it aims to remedy the evil of companies' firing employees for reporting putative securities fraud. Where the statutory language supports a broad reading that comports with that remedial purpose, precedent calls for courts to implement that broad reading. See Dudley, 333 F.3d at 307. The majority inexplicably fail to heed this call.

Second, at the opposite end of the interpretative spectrum is the so-called rule of lenity, an "ancient rule of

Congress to change them. We should not legislate for them.'" Pac. Operators, 2012 WL 75045, at *9 (quoting Herb's Welding, Inc. v. Gray, 470 U.S. 414, 427 (1985)).

statutory construction that penal statutes should be strictly construed against the government . . . and in favor of the persons on whom penalties are sought to be imposed."  3 Singer, Sutherland Statutory Construction § 59:3.  In Ozuna-Cabrera, a criminal case, we held that this principle had no place because the text did not support the defendant's proposed limitations.  See 663 F.3d at 498-99.  Now, in a context where we are supposed to default to breadth and reject narrowness, the majority nevertheless impose analogous extratextual limitations.  This is precisely backwards.

In fact, in rejecting a broad reading of § 806 and imposing a narrow one, the majority rely in significant part on cases where (unlike here) narrow interpretations were absolutely appropriate under the rule of lenity.  For example, in I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc. (NCIR), 502 U.S. 183 (1991), the Supreme Court narrowed the scope of the word "employment" as used in a statute imposing restrictive bond conditions on aliens embroiled in removal proceedings.[36]  In other words, by narrowing the types of employment that immigrants could not undertake while out on bond, the Court benefitted them and thereby honored the rule of lenity.  NCIR does not by any means

_____

[36] The rule of lenity applies to immigrants in removal proceedings as well as defendants in criminal proceedings.  See, e.g., I.N.S. v. St. Cyr, 533 U.S. 289, 320 (2001) (relying on "'the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien'" (quoting I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987))).

suggest that a restrictive interpretation is appropriate to strip intentionally broad legal protections from whistleblowers.[37]

Third and last is the presumption against implied rights of action. The majority repeatedly cite cases expressly applying this principle as if these cases somehow support limiting explicit causes of action, too. Here is a list of several such cases on which the majority wrongly rely: Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2303 (2011) (holding that a mutual fund adviser may not be found liable for a mutual fund's violation of SEC Rule 10b-5, in part because of "the narrow scope that [courts] must give the implied private right of action"); Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 772 (2008) (noting that courts should limit the scope of implied rights of action because judicial creation of such remedies "runs contrary to the established principle that '[t]he jurisdiction of the federal courts is guarded against expansion by judicial interpretation'" (quoting Cannon v. Univ. of Chi., 441 U.S. 677, 746-47 (1979) (Powell, J., dissenting))); Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S.

---

[37] Let me be perfectly clear: my point is that the majority are wrong to rely on cases subject to the rule of lenity. And despite disclaiming any reliance on the rule, the majority still rely on cases where the rule applies. Compare Maj. Op. 19-20 (providing that the majority "follow the same reasoning" as NCIR), with Maj. Op. 35 (providing that "the rule of lenity has no place in our interpretation of § 1514A(a)").

164, 176 (1994) (holding that the implied right of action under SEC Rule 10b-5 does not extend to aiders and abetters because "Congress knew how to impose aiding and abetting liability when it chose to do so"); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 734 (1975) (limiting the availability of the implied right of action under Rule 10b-5 to actual purchasers and sellers of securities, in part because "[w]hen Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble doing so expressly").  Here, we are not faced with an implied right of action that should be applied narrowly; instead, we are dealing with a statute that expressly creates a broad right of action for employee-whistleblowers who suffer retaliation at their employers' hands.  By rejecting Congress's intentional breadth, the majority undermine the legislative process in precisely the same way that the Supreme Court has warned against time and time again in the context of implied rights of action.  That they do so by restricting a broad statute rather than expanding a narrow statute is beside the point: they are still usurping Congress's lawmaking role in our system of government.

Even more egregious, though, is the majority's conclusion — after thirty-five pages construing a statutory provision to which they say "different readings may be given," Maj. Op. 14 — that the statute is "not ambiguous" and even "clear" in imposing a limitation on the word "employee" that appears nowhere in the

statute's text.  Id. at 44, 49.  This peculiar determination[38]

appears to be nothing more than a mechanism for rejecting the views

of multiple federal agencies[39] that come into daily contact with the

Sarbanes-Oxley Act and its whistleblower provision, and for

downplaying this court's earlier determination that agency views

are entitled to deference.  In fact, the clearest thing about the

statute is its breadth, as the Department of Labor's regulations

confirm.

      As I've mentioned above, the Department of Labor has

adjudicatory authority over Sarbanes-Oxley whistleblower

complaints.[40]  18 U.S.C. § 1514A(b)(1).  To exercise that authority,

the Department of Labor has promulgated regulations regarding

Sarbanes-Oxley.  29 C.F.R. § 1980-100 et seq.  The regulations

specifically provide that Sarbanes-Oxley's whistleblower protection

extends to employees of contractors of public companies.  Id.

---

[38]  The determination is peculiar, in part, because of the basic principle that a court will generally look beyond a statute's text only when interpreting ambiguous statutes.  See, e.g., Gen. Motors Corp. v. Darling's, 444 F.3d 98, 108 (1st Cir. 2006) (noting that "we . . . will only look behind the plain language to the legislative history if we find the statute ambiguous" (internal quotation marks omitted)).

[39]  Although my dissent limits its discussion to the Department of Labor's regulations, the Securities and Exchange Commission, too, has filed an amicus brief in this case urging the same broad interpretation of § 806.

[40]  Congress has not given Labor substantive rule-making authority, but this does not matter for reasons I will discuss shortly.

§ 1980.101.  On this point, Labor found the statute as clear as I do: the regulations proclaim that they are non-interpretative, 69 Fed. Reg. 52104, 52105 (Aug. 24, 2004), so Labor must have thought the statute simply means what it says: "[n]o . . . contractor . . . of such company[] may discharge . . . an employee" for reporting fraud.  18 U.S.C. § 1514A(a).  And we have previously held that the regulations are entitled to Chevron deference, Day, 555 F.3d at 54 & n.7, meaning that we should honor Labor's read of the statute unless it is arbitrary and capricious or contrary to law.  Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984).

Again, all this would seem to end our inquiry.  Not only does Sarbanes-Oxley § 806 by its terms protect employees of contractors of public companies, but the agency that handles every § 806 whistleblower complaint has issued formal regulations recognizing that straightforward interpretation, and this court has held that the regulations are owed deference.  But, somehow, the authority of all three branches of government does not win the day: the majority disregard Congress's broad language, reject the agency's regulations out of hand, and do their best to neutralize this court's decision in Day by labeling it both distinguishable and dicta.  Maj. Op. 45 n.22.

Here is what we said in Day: "Both the DOL regulations, which are entitled to Chevron deference, and the caselaw establish

-69-

that the term 'reasonable belief' has both a subjective and objective component.  We agree."  Day, 555 F.3d at 54.  We then went on to explain why the regulations were due Chevron deference, noting among other things that "Congress explicitly delegated to the Secretary of Labor authority to enforce § 1514A by formal adjudication."  Id. at 54 n.7.  This is not the stuff of dicta.  We did not merely "accept . . . that certain DOL regulations . . . were entitled to Chevron deference," Maj. Op. 45 n.22 — we stated affirmatively that they were, explained our reasoning on the point, and relied on the conclusion in reaching our result.  And our broad statement may not have been "concerned with the precise regulations at issue here," id., but it did not purport to involve precise regulations; instead, it spoke sweepingly of Labor's regulations regarding § 1514A.  If Day remains good law then it controls here and we owe deference to Labor's regulations.

That said, we need not go so far as to apply Chevron deference here.  While the Department of Labor does suggest that Day compels some degree of deference, it concedes that the regulations are properly due something less than Chevron deference.  Naturally, the Skidmore doctrine comes to mind.

In Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), the Supreme Court held that considered agency views — even informal ones — should provide guidance to the courts to the extent those views have the "power to persuade."  We have applied the Skidmore

-70-

rule to agencies' views in cases "'where statutory circumstances indicate no [congressional] intent to delegate general authority to make rules with force of law.'"  Navarro v. Pfizer Corp., 261 F.3d 90, 99 (1st Cir. 2001) (quoting United States v. Mead Corp., 533 U.S. 218, 237 (2001)).  Here we have such a case.  Even though Labor lacks statutory authority to issue substantive rules regarding § 806, and even though Labor has labeled its regulations non-interpretative, under Skidmore we still cannot just throw its considered views out the window.

Nevertheless, the majority conclude that Skidmore has no place here.  First, they say, the statute is unambiguous and, therefore, Labor can add nothing to its construction. Maj. Op. 44. On the heels of the majority's lengthy statutory-interpretation analysis, this claim holds no water.  A statute that is susceptible of multiple interpretations and whose meaning requires over thirty pages to explain is neither clear nor unambiguous by definition. See, e.g., 2A Singer, Sutherland Statutory Construction § 45:2 ("Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses.").  And if the statute is not, in fact, unambiguous, then Skidmore deference is in play.

In guiding judicial inquiry into the appropriate level of respect we should give Labor's views, Skidmore requires consideration of "the thoroughness evident in [Labor's]

-71-

consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." Skidmore, 323 U.S. at 140. First, contrary to the majority's determination that Labor provided "no reasoning," Maj. Op. 48, Labor spent a paragraph explaining that the language of § 806, taken literally, extends protection to employees of contractors of public companies. See 69 Fed. Reg. at 52,105-06. The majority never convincingly overcome the agency's simple application of basic grammar to the statute,[41] and so can only pretend it isn't there.

Continuing with the other Skidmore factors, the agency's reasoning is valid because the statute's plain language does extend coverage to employees of contractors (as I have explained above). And as for consistency, for as long as the regulations have existed they have consistently extended protection to employees of contractors of public companies. Compare 29 C.F.R. § 1980.101 (2003), with 29 C.F.R. § 1980.101 (2011), as amended by 76 Fed. Reg. 68,084 (Nov. 3, 2011). The majority cannot claim the same consistency in this court's jurisprudence. Compare Day, 555 F.3d at 52, 54 & n.7 (noting that § 806 aims to "prohibit[] employers

----

[41] In fact, the majority implicitly acknowledge the validity of Labor's grammatical reading earlier in their opinion, when they say it merits "little discussion" that the statute "may be read differently as to the scope of the protected 'employees' as a matter of grammar." Maj. Op. 15. If Labor's paragraph applying the basic rules of language to the statute constitutes "no reasoning," then one wonders how to characterize the majority's "little discussion."

from retaliating against employees" and "to encourage and protect employees who report fraudulent activity," and holding that the Labor regulations "are entitled to <u>Chevron</u> deference" (internal quotation marks and brackets omitted)), <u>with</u> Maj. Op. 45 n.22. Because all three <u>Skidmore</u> factors weigh in Labor's favor, we owe deference to the Department of Labor's regulations. And that means § 806 extends whistleblower protection to employees of contractors of public companies.

To sum the whole thing up, § 806 plainly protects whistleblower employees of contractors of public companies; digging deeper into the section's context and legislative history only confirms the breadth of § 806's protections; considered agency views further support a broad read of the statute; and the majority have had to work very hard to reject not only our own precedent but also the views of the other branches of government, to say nothing of grammar and logic. The simple answer to the certified question from the district court[42] is yes. For these reasons, I dissent.

---

[42] "Does the whistleblower protection afforded by § 806(a) of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, apply to an employee of a contractor or subcontractor of a public company, when that employee reports activity which he or she reasonably believes may constitute a violation of 18 U.S.C. §§ 1341, 1343, 1344, or 1348; any rule or regulation of the Securities and Exchange Commission; or any provision of Federal law and such a violation would relate to fraud against shareholders of the public company?"